**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

ERIC BYNUM ALDRIDGE,

    Plaintiff,

vs.                                                CASE NO. 05-CV-0002-IPJ-NE

DAIKIN AMERICA, INC.,

    Defendant.

## **MEMORANDUM OPINION**

Pending before the court is Defendant's motion for summary judgment (doc. 26). Plaintiff has filed a response and an affidavit in opposition to Defendant's motion (docs. 31, 33). Defendant has filed a reply (doc. 37) to Plaintiff's response and affidavit. The court has considered the motions, evidence and arguments submitted by the parties in support of their respective positions.

### **I.  FACTUAL BACKGROUND**

On January 3, 1995, Plaintiff Eric Aldridge began employment with Defendant Daikin America, Inc. (hereinafter "Daikin"). Aldridge Depo. at 63. In August 2000, Mr. Aldridge joined the Army National Guard (hereinafter "Guard"). Aldridge Depo. at 171. On May 30, 2004, Mr. Aldridge was sent home from Daikin's work site after declaring, "I quit!" after an altercation with Daikin's maintenance supervisor regarding Daikin's sign-in policy. Aldridge Depo. at 56-

1

58. On June 3, 2004, Mr. Aldridge submitted a written resignation to Daikin via electronic mail. Aldridge Decl. at ¶ 11. One week after quitting his position at Daikin, Mr. Aldridge began employment with another company. Aldridge Depo. at 30.

During the period of his employment after he joined the Guard, Mr. Aldridge asserts that he was subjected to negative treatment because of his affiliation with the Guard. Ultimately, he claims he was terminated or, in the alternative, forced to resign from his job due to the harsh treatment he endured.[1] While employed by Daikin, Mr. Aldridge alleges the following incidents occurred:

(a) He was harrassed and called a "weekend soldier" by Daikin management, Eubanks Aff. at ¶ 2,

(b) Daikin team leaders were told to check everything he did and watch for missteps, Eubanks Aff. at ¶ 3,

(c) Daikin management employed an "unwritten rule" disfavoring employee affiliation with the Guard, Eubanks Aff. at ¶ 2,

(d) Daikin management told other Team Leaders they wanted Mr. Aldridge

---

[1]In his complaint, Plaintiff also asserts other claims against defendant beyond wrongful termination and, in the alternative, constructive discharge. Compl. ¶ 7. However, Plaintiff failed to brief these assertions in Plaintiff's response to Defendant's motion for summary judgment. Having failed to brief these other claims at the summary judgment level, Plaintiff is deemed to have abandoned said claims. *See Iraola & CIA, S.A. v. Kimberly-Clark, Corp.*, 325 F.3d 1274, 1284 (11th Cir. 2003); *see also Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001).

gone from Daikin, Eubanks Aff. at ¶ 3,

(e) Daikin management told Team Leaders they were to blame missteps at the plant on Mr. Aldridge, Eubanks Aff. at ¶ 3,

(f) Daikin management told one particular Team Leader that Mr. Aldridge would never be a Team Leader because he "didn't have what it took" despite Mr. Aldridge's being chosen as a temporary team leader prior to his enlistment in the Guard, Eubanks Aff. at ¶ 4,

(g) Daikin accused Mr. Aldridge of a serious "misoperation" and "safety violation" involving a transfer of gases, Keith Depo. at 83-84,

(h) Mr. Aldridge found a note in his work locker which read, "Choose Army or Daikin Take a hint." Aldridge Decl. at ¶ 5,

(i) A Team Leader referred to him as, "[T]wo part-times." Aldridge Decl. at ¶ 5,

(j) Mr. Aldridge reported the matter to the Human Resources Director, but received an unsatisfactory response from the Director who then questioned him about a Guard duty extension. Aldridge Decl. at ¶ 5,

(k) Few of his co-workers would speak to him. Aldridge Decl. at ¶ 6, and

(l) Two telephone calls were made to his house from Daikin's work facility. The person who called spoke in an artificial accent and asked to speak to Mr. Aldridge's former girlfriend. Aldridge Decl. at ¶ 7.

## II.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23.  The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro. 56(e).  In meeting this burden, the non-

4

moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed. R. Civ. Pro. 56(e); *Matsushita*, 475 U.S. at 587; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir. 1991).

### III.   DISCUSSION

Congress enacted USERRA to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military. *Coffman v. Chugach Support Serv., Inc.,* 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301 (2002)). Sections 4311 and 4312 of the USERRA provide separate and distinct statutory protections for service members. *Coffman*, 411 F.3d at 1234 (citing *Wrigglesworth v. Brumbaugh,* 121 F.Supp.2d 1126, 1134 (W.D.Mich. 2000)). Section 4311 prohibits employers from discriminating against employees on the basis of military service and retaliating against individuals, whether service members or not, who testify or give statements on behalf of a USERRA claimant. *Coffman*, 411 F.3d at 1234. Section 4311 provides, in pertinent part, that:

(a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.
(b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter.
(c) An employer shall be considered to have engaged in actions prohibited--
(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service; or
(2) under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter, (B) testimony or making of a statement in or in connection with any proceeding under this chapter, (C) assistance or other participation in an investigation under this chapter, or (D) exercise of a right provided for in this chapter, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right.

*Coffman*, 411 F.3d at 1234-35 (quoting 38 U.S.C. § 4311 (2002)).

Courts which have interpreted USERRA indicated that the burden-shifting framework approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401 (1983) is used to determine whether an employer discharged a reservist in violation of USERRA. *Sanguinetti v. United*

*Parcel Serv., Inc.*, 114 F.Supp.2d 1313, 1318 (S.D. Fla. 2000).  To recover under USERRA, Plaintiff must first establish a prima facie case of discrimination by showing that his military service was a substantial or motivating factor in Daikin's decision to terminate or constructively discharge him.  See *Sanguinetti*, 114 F.Supp.2d at 1318.

Plaintiff has not established a prima facie case for USERRA violation. Plaintiff's potential prima facie case fails on two fronts.  First, Plaintiff has not shown that Defendant terminated him.  Secondly, Plaintiff has not shown that Defendant constructively discharged him.  Without a showing that he was terminated or constructively discharged, Plaintiff cannot show that his military status was a motivating factor in such a decision, since no such decision was ever communicated to him.  Having willfully resigned, Plaintiff essentially suffered no adverse employment action.

Because he was never told that he was being terminated, Mr. Aldridge has not suffered the adverse employment action of wrongful termination.  When an employee is left to simply infer and deduce his employment status from surrounding events, no unequivocal communication of an adverse employment decision has occurred.  *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1203 (11th Cir. 2003).  In *Wright*, the plaintiff employee was advised to look for employment elsewhere while still employed by the defendant employer.  *Id.*  The

employee believed his employer had "made up their mind that they were going to fire [him]." *Id.* The court held that plaintiff's conclusions based on circumstantial evidence provided him with no evidence of neither a firm decision to fire him nor a communication of such a decision. *Id.* The court ultimately used the date at which defendant communicated a decision to terminate to plaintiff as the date at which the plaintiff's time period in which to file any charges began. *Id.* The court noted the importance of the date of communication because, before it, employees would file charges before the actual discriminatory conduct and the EEOC would be forced to investigate hypothetical charges. *Id.*

Mr. Aldridge was not terminated by Defendant Daikin. In support of his assertion that Defendant terminated him, Plaintiff offers the deposition testimony of Human Resources Director Forest Keith. In his testimony, Mr. Keith testified that by the time he received Mr. Aldridge's email stating his intention to "seek employment elsewhere," Daikin management had already decided to terminate Mr. Aldridge's employment. Keith Depo. at 173. However, Mr. Aldridge presents no evidence that this decision to terminate his employment was ever communicated to him. Because he was never told that he was being terminated, Mr.Aldridge never suffered a wrongful termination. In fact, he did not suffer any type of termination. According to the evidence presented by Mr. Aldridge, he only learned of Daikin's plans to terminate him during Mr. Keith's deposition testimony, this testimony

occurred long after he communicated his resignation to Daikin.  Keith Depo at 173.  Mr. Aldridge resigned, he was not terminated.

Likewise, Plaintiff Aldridge was not constructively discharged by Defendant Daikin.  "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."  *Penn. State Police v. Suders*, 124 S.Ct. 2342, 2344-45 (2004).  "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  *Suders*, 124 S.Ct. at 2344-45.

In support of his contention that he was constructively discharged, Plaintiff offers the testimony of a Daikin Team Leader, Mr. Eubanks, who asserts Daikin had an "unwritten rule that Daikin didn't want its employees to be in the Guard."  Eubanks Aff. at ¶ 2.  Mr. Eubanks claims Mr. Aldridge essentially wore a "bull's eye" on his back after he joined the Guard.  *Id.*  Mr. Eubanks asserts that Daikin officials wanted Mr. Aldridge fired from Daikin.  Eubanks Aff. at ¶ 3.  Mr. Eubanks alleges that Daikin management ordered other team leaders to examine Mr. Aldridge carefully and report every misstep.  Eubanks Aff. at ¶ 3.  Mr. Eubanks also claims that Daikin management ordered Team Leaders to try to pin anything that went wrong at the plant on Mr. Aldridge.  Eubanks Aff. at ¶ 3.  Mr. Eubanks asserts that Mr. Aldridge was a "good operator and always did things by the book."

Eubanks Aff. at ¶ 3.

According to Mr. Eubanks, Mr. Aldridge's supervisor, Lavon Wilhite targeted Mr. Aldridge for hostile comments or treatment. Eubanks Aff. ¶ 4. Although Mr. Wilhite selected Mr. Aldridge to serve as a temporary leader in the regular team leader's absence prior to Mr. Aldridge joining the Guard, Mr. Eubanks asserts that Mr. Wilhite told Mr. Eubanks that Mr. Aldridge would never be a team leader because he "didn't have what it took." Eubanks Aff. at ¶ 4. Mr. Aldridge claims Mr. Wilhite, upon learning that Mr. Aldridge had joined the Guard, said, "You can't be in the Guard and be a Team Leader." Aldridge Depo. at 81-82. Mr. Wilhite also allegedly made demeaning comments to Mr. Aldridge about his Guard service in front of coworkers. Aldridge Depo. at 81-82.

Mr. Aldridge alleges that he was told by a Daikin shift supervisor that Daiken management would not like the fact that Mr. Aldridge would have to be gone on Guard duty. Aldridge Decl. at ¶ 3. Additionally, Mr. Aldridge produced a note he claims was placed in his work locker which read, "Choose Army or Daikin Take a hint." *Id.* at ¶ 5. Mr. Aldridge also received two phone calls from Daikin late at night. Aldridge Decl. at ¶ 7. The caller asked to speak to Mr. Aldridge's former girlfriend. *Id.* Ultimately, Mr. Aldridge was involved in an argument regarding Daikin's sign-in policy with a Daikin maintenance supervisor as he arrived at work. Aldridge Depo. at 56.

Mr. Aldridge's work conditions were not so intolerable that a reasonable person would have resigned.  Viewing the evidence presented by Mr. Eubanks and Mr. Aldridge in a light most favorable to Plaintiff, Daikin management closely scrutinized Mr. Aldridge's work.  The stray comments made by Mr. Wilhite over the course of four years, while inappropriate, were not so severe as to drive a reasonable person to resign.   At absolute worst, Mr. Aldridge may have been under a closer watch than other Daikin employees.  He also may have been the target of negative comments about the time he spent serving the country in the National Guard.   He was not, however, forced to resign from his job.

Daikin management took a proactive approach to examining Mr. Aldridge's alleged mistreatment.  Aldridge Depo.  Ex 34-A , Transc. of Tape Recordings at 185-86.  Daikin management told Mr. Aldridge they had investigated his previous claims.  *Id.* at 184-85.  Daikin management also asked Mr. Aldridge for the specifics of his alleged mistreatment.  *Id.* at 186.  Mr. Aldridge refused to provide the information that would allow Daikin to discover the details and, potentially, the perpetrators of his alleged mistreatment.  *Id.*

The evidence presented by Plaintiff shows that he willingly resigned to immediately go to work for another company without pressure from his employer to do so and not under such intolerable conditions that would lead a reasonable person to resign.

11

## CONCLUSION

The court having considered the foregoing, and finding that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial, the court **ORDERS** that the defendant's motion for summary judgment is hereby **GRANTED**. The plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** this the 6th day of October, 2005.

*/s/ Inge Prytz Johnson*
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE